## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. HILL et ux. (No. 3616.)

Court of Civil Appeals of Texas. Texarkana. Jan. 3, 1929.

Rehearing Denied Jan. 24, 1929.

King, Mahaffey & Wheeler, of Texarkana, and J. A. Ward, of Mt. Pleasant, for appellant.

J. H. Beavers, of Winnsboro, and R. T. Wilkinson, Jr., of Mt. Vernon, for appellees.

HODGES, J. On December 29, 1927, Mrs. Sallie G. Hill, wife of G. P. Hill, was injured at a crossing on the appellant's railroad about 3½ miles west of Mt. Pleasant in Titus county. The injury was caused by a collision between one of appellant's trains and an automobile in which Mr. and Mrs. Hill were riding. This appeal is from a judgment in favor of Hill and wife for the sum of $5,000 for the injuries sustained by the wife. The train which struck the automobile consisted of two passenger coaches propelled by electricity, operated by a motorman. The place where the injury occurred was where the public highway leading from Mt. Pleasant west toward Mt. Vernon crosses appellant's track. In their petition the plaintiffs charged negligence on the part of the motorman in running at an excessive rate of speed, failing to keep a lookout for persons crossing the track, failing to give the statutory signals in approaching the crossing, and failing to use proper care to stop the train after discovering the peril of the occupants

of the car. They also charged that the appellant was negligent in failing to keep a flagman at that crossing, and in failing to equip its motorcar with a bell and whistle sufficient to give the necessary warning of the train's approach. Among other defenses, the appellant pleaded contributory negligence on the part of the plaintiffs. In a general charge the court submitted the issues raised of negligence stated in the pleadings, except the failure to equip the train with a sufficient bell and whistle.

The testimony shows that the railroad track runs practically east and west. The highway leading west from Mt. Pleasant runs on the north side of the railroad for about 3½ miles. It then turns south, crossing the track, and continues west on the south side of the track. While passing over the above-named crossing from the north to the south side of the railroad track, the automobile in which Hill and his wife were traveling was struck by appellant's cars coming from the west. The evidence shows that west of the crossing the railroad track runs through a cut, on the north side of which is an embankment estimated by the witnesses at from 10 to 15 feet high. That embankment to some extent obstructed the view of trains approaching the crossing from the west. It was claimed by Hill, who was at the time driving his car, that this embankment prevented him from seeing the approaching train until he was almost on the track. Hill testified: "Just before I got to the crossing I slowed up on account of meeting a party in a Ford touring car. * * * Yes, sir, he had crossed the crossing before I got to him, and I had to drive to the right to let him by, and I slowed down. No, there wasn't any unusual noise about the car I was traveling in. I don't suppose it would make any more noise than any car. No, sir, as we approached the crossing I wasn't talking and laughing. I had a cold and wasn't talking at all. No, sir, I didn't hear the train before I reached the crossing. I knew the railroad track was there, and was watching for the train. Well, I was looking all the time, but I didn't discover the train until I was right on the track—or within a few feet of the track proper; and I looked out and saw the train I guess about 150 feet down the track. It was west of the crossing. When I first observed the train my car was within a few feet of the railroad track—the front of the car was. I put the gas to it because I knew it was too late to try to stop; and I knew if I tried to back it would kill my engine on the track. So I put the juice to it and tried to escape. * * * When I first saw the train I couldn't have been traveling over ten miles an hour. No, sir, I didn't hear any whistle blow prior to the time I saw the train. No, sir, there was no bell rung."

William Mason, who was operating the motorcar at the time the injury occurred, tes-tified that he gave the statutory warnings in approaching that crossing. He stated that he saw the car as it was approaching the crossing; it was 30 or 40 feet from the crossing when he first discovered it, and was traveling about 10 or 12 miles an hour, he thought. He blew his whistle. His train was traveling about 35 or 40 miles an hour at that time. He said: "Yes, sir, when I saw the car approaching the crossing he (Hill) was traveling about ten or twelve miles an hour, and he appeared to slow down when I whistled for him, and then he seemed to spurt across. Well, when he slowed down there I thought he was going to stop. When I saw him spurt up that way I gave one long whistle and then threw on the brakes because I saw he was going to try to get across. I didn't have any control over the power because I didn't have any because I had shut the power off a mile from there. Yes, sir, I applied the air all I could."

Among the errors assigned by the appellant is one which complains of the action of the court in submitting the issue of negligence on the part of the motorman in failing to keep a lookout for persons who might be on or near the track. That assignment is based upon the proposition that there is not sufficient evidence to support a finding that the motorman did on that occasion fail to keep such a lookout. It will be seen, from the testimony of the motorman which has just been quoted, that he discovered the automobile some distance from the track and when the train was about 150 feet away; that he did not then make any effort to stop or reduce the speed of the train, being under the impression, he said, that the driver of the automobile would stop. That testimony is undisputed and is entirely consistent with the facts otherwise appearing. Evidently the collision was not due to the failure of the motorman to sooner discover the approaching automobile, but to his failure to make an effort to stop his train after he made the discovery. The evidence did not, we think, authorize the submission of that issue.

Appellant also assigns as error the action of the court in submitting as a ground of recovery the failure of the appellant to keep a flagman at the crossing to warn people of the approach of trains. It has been repeatedly held by the courts of this state that the requirement to keep a flagman at a public crossing is an extra precaution required only to guard the public against extraordinary hazards. Missouri, K. & T. Ry. Co. v. Magee, 92 Tex. 616, 50 S. W. 1013; La. Ry. & Nav. Co. v. Loudermilk (Tex. Civ. App.) 295 S. W. 193; Missouri, K. & T. R. Co. v. Long (Tex. Com. App.) 299 S. W. 854. A fair inference from facts in this case does not warrant the conclusion that this particular crossing presented a situation so hazardous as to require the presence of a flagman under the rule an-

nounced in the cases cited above. While there was evidence that the crossing was on a much traveled highway in a populous community, it further appeared that it was located some distance in the country and passed over only one railway track at that point. A local railway agent testified that according to his records eight trains passed each way over that road every 24 hours, and that testimony was not disputed. The most reliable evidence of the physical conditions existing at the crossing is to be found in the testimony of C. E. Cowan, a witness for the appellees. Cowan was apparently disinterested, and had made actual measurements upon the ground which were not questioned. Among other things, he said: "Yes, from a point 4 feet from the north edge of the highway toward the center of the highway 176 feet east of the crossing one could see a man standing in the center of the track 232 feet west of the crossing. Yes, sir, that was standing back in the highway, about the center of the highway. That highway begins to curve right there. Yes, sir, it would be depending on how far a fellow was up on that curve how far a fellow could see. Yes, sir, standing 100 feet east of the crossing, in the center of the road, you could see 400 feet; and then stepping 4 feet to the side, that would make that much difference. Yes, standing 100 feet east of the crossing, at a point on the north edge of the highway, you could see a man 334 feet west of the crossing. Yes, sir, that highway is curving a little there. Yes, sir, when you get 100 feet east of the crossing, at a point on the north edge of the highway, you could only see 334 feet. Standing in the center of the highway at 100 feet east of the crossing one could see a man standing in the center of the railroad for 389 feet."

We think the following language used in the Loudermilk Case is equally applicable here: "It should also be said, in this connection, that the dangers to be considered are those arising from the usual and customary operation of trains at that place conducted in the exercise of ordinary care for the safety of those who may be using the same degree of care in crossing the track. Railroad companies should not be required to keep a flagman at crossings for the purpose of warning reckless travelers. They owe such no duty till their peril is discovered. Nor should they be expected to keep a flagman at crossings merely to guard against the negligent operation of trains by their own employees. If the injured party is guilty of negligence, his negligence is in law the proximate cause. If the employees in charge of the train are guilty of negligence in its operation, causing a collision and injury, their negligence is the proximate cause. It follows, then, that the duty of providing a flagman arises only when demanded by ordinary prudence to protect travelers of ordinary care against dangers resulting from the prudent and usual operation of trains."

The remaining assignments are overruled. The issue of discovered peril was submitted in such a manner as to render it unnecessary to give the special charges on that subject requested by the appellant.

For the errors indicated, the judgment will be reversed and the cause remanded for a new trial.